
THE ATTORNEY GENERAL

OF TEXAS

AUSTIN 11, TEXAS

Gerald C. Mann

XXXXXXXXXXXXXXXXXXXXXXXX
ATTORNEY GENERAL

April 26, 1939

Hon. George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Mr. Sheppard:

> Opinion No. O-633
> Re: Place where "market value" should
> be determined in taxing natural gas
> under Art. 7049-b

This is in answer to your inquiry of April 13, 1939, concerning the "gross receipts tax" on natural gas provided for in Article 7049-b of the Revised Civil Statutes.

The facts involved in your inquiry are as follows: A certain company, which we will refer to as the "producer", owns and operates some gas wells in Hutchison and Carson Counties, Texas, and it sells its gas to a pipe line company, which is another and separate concern. The pipe line company maintains an eighteen inch pipe line, conveying gas from that field, which line is approximately seven miles from this producer's wells, and the pressure in this eighteen inch pipe line averages 320 pounds per square inch. The pressure of most of the gas wells in this field is greater than 320 pounds; but the pressure of this particular producer's gas wells is less, being only 250 pounds per square inch. This producer made a contract to sell the gas produced by its wells to this pipe line company and to deliver it to the pipe line of the pipe line company, at a price of three and one-half (3½) cents per thousand cubic feet, and the contract provided: "***The Seller agrees to sell and deliver to the Buyer at the points of delivery hereinafter designated (which is the Buyer's pipe line).****Deliveries of gas hereunder shall be made by Buyer to Seller at a pressure sufficient to enter the pipe lines of the Buyer against the varied working pressures therein." It is agreed that three and one-half (3½) cents per thousand cubic feet is "the actual market value" of this gas at the pipe line company's eighteen inch pipe line seven miles from the wells, where it is sold and delivered. Under this contract it was necessary for this producer to build its own pipe line from its wells to the pipe line company's eighteen inch pipe line, a distance of seven miles, and it was also necessary for this producer to install "compressor stations", which consist of machinery that raises the pressure of its gas, in order that its gas

would go into the pipe line company's eighteen inch line. By virtue of building this seven mile line and these "compressor stations" it costs the producer one-half (½¢) cent per thousand cubic feet to transport its gas from its wells to the place of delivery where it is sold at the pipe line company's eighteen inch line seven miles away.

The question you want us to answer is whether you should charge the natural gas tax, provided for in Article 7047-b on the basis of the "actual market value" at the place of sale seven miles from the well (which is 3½ per 1000 cubic feet) or on the basis of the "the actual market value" at the well (which is only 3¢ per 1000 cubic feet).

The material part of the statute in question, which is House Bill 547, Ch. 73, p. 111, Acts 1931, 42nd. Leg., amended by House Bill 8, Ch. 495, p. 495, p. 2040, Acts 1936, 3rd. Called Session 44th. Leg., all of which is now codified as Article 7047-b of Vernon's Annotated Revised Civil Statutes of Texas, reads as follows:

"Sec. 1 (a) That from and after the date herein fixed, every person engaging or continuing within this State, in the business of producing and saving in paying quantities, for sale or for profit, any natural gas, including casinghead gas, from the soil or waters of this State, and

"(b) Every person who imports natural gas into this State and thereafter sells the same in intrastate commerce in this State, the tax to be imposed on the first sale; (provided, however, that if any gas is imported into this State from another State, in which latter State a severance, occupation or excise tax is imposed, the person importing such gas shall not be required to pay another tax thereon under the provisions of this Act),

"(c) Are hereby declared to be "producers" and engaged in the business of producing natural gas within this State and shall make quarterly on the 25th day of January, April, July and October each year, a report to the Comptroller,**"

"Sec. 3. A tax shall be paid by each such producer on the amount of gas produced and saved within this State, and on gas imported into the State, upon the first sale thereof in intrastate commerce upon the following basis:

"A tax equivalent to three per cent (3%) of the market value of the total amount of gas produced and saved within this State, or sold, if imported into this State, at the actual market value thereof, as and when produced.*****"

It will be noticed that in Section 3 it says: 'A tax shall be paid***upon the following basis: A tax equivalent to three per cent (3%) of the market value***at the actual market value thereof, as and when produced." We think these are the controlling words, and that the phrase "as and when produced" refers to all of the gas, both that produced in the State and that imported into the State.

It might be contended that the phrase "upon the first sale thereof" controls, and if that phrase was standing alone we think it would control, but we must look at the statute as a whole and when we do that we conclude that it must yield and give way to the phrase in the next sentence, towit, "as and when produced."

It might also be contended that the phrase "as and when produced" applies only to that part of the sentence set off in commas, towit, "if imported into this State"; that is, it might be said that the phrase applies only to imported gas; but we think that phrase applies to and modifies the whole sentence. The Legislature was talking about the taxing of all gas "as and when produced".

What does the word "produce mean? Webster's New International Dictionary, 2nd Ed., gives a definition of the word "produce" as follows:

> "To bring forth, as young, or as a natural product or growth; to give birth to; to bear; generate; yield; furnish; as, the earth produces grass; trees produce fruit."

We think that natural gas is produced when it comes out of the ground. The mouth of the well is the place where it is produced.

We frankly admit, and anyone else, regardless of which side of this question they urge, must admit, that the words of this statute are doubtful. The Supreme Court of the United States in the case of United States v. Merriam, 263 U. S. 179, 44 S. Ct. 69, 68 L. Ed. 240, 29 A. L. R. 1547, said:

> "*****in statutes levying taxes the literal meaning of the words employed is most important, for such statutes are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the Government and in favor of the taxpayer."

The same rule has been adopted by the courts in Texas. Franklin Fire Ins. Co. v. Hall, (Tex. Sup. Ct.) 112 Tex. 332, 247 S. W. 822; Western Public Service Co. v. Meharg, (Tex. Comm. App.) 116 Tex. 193, 292 S. W. 168; and Daniel v. Life Ins. Co. of Virginia, (Tex. Civ. App.) 102 S. W. 2nd 256. Applying that rule to the case in question we would be compelled to hold that the tax should be charged on the basis of the market value of

the gas at the well, which is the construction most favorable to the taxpayer.

We have been unable to find any tax cases on this question in this State or any other jurisdiction. However, we have found where a similiar question has arisen in several states in regard to whether the producer, who operates the well, should pay the royalty owners their share of the proceeds from the sale of the oil or gas several miles from the well to where it is piped by the producer and sold to a pipe line company, or should pay the royalty owners on the basis of the lower market value at the mouth of the well. This question of the amount to be paid to the royalty owners has arisen where the lease contract is ambiguous or silent on the question; and in those cases the courts have held that the payment should be on the basis of the market value at the well. In 3 Summers Oil and Gas 415, it is said:

> "One of the principal questions arising in connection with gas royalty clauses of the types above mentioned is whether the lessor is entitled to be paid on the basis of the value of the gas at the well, upon the basis of the price actually received at the point, where the gas is delivered into the pipe line of a purchasing company, or at the price received by the lessee where it delivers gas to consumers directly through its own lines. Where leases provide for the payment of one-eighth royalty, the value of one-eighth of the gas, or the market value thereof, most courts hold that the lessor's royalty should be computed upon the basis of the market value actually exists, and if it does not, upon the basis of the reasonable value of such gas as established by competent evidence."

This question of the basis on which a producer should pay royalty, where the lease contract is not clear, has been acted on by courts in Kansas, Kentucky and Louisiana. In the case of Scott v. Steinberger, (Kan. Sup. Ct.) 113 Kan. 67, 213 Pac. 646, the court said:

> "***the dispute arises whether the plaintiff was entitled to the value of the gas at the wells or at the price at which it was sold at the end of the pipe line.***

> "The terms of the lease are somewhat ambiguous as to the point where the gas was to be measured and its price fixed. There was no pipe line in the vicinity when the contract was made. Evidently the parties contemplated that, if oil or gas in paying quantities was found, some pipe line company would build into the field and transport it to places of consumption.*****

"We think the parties contemplated and the provision should be construed that gas, if produced, should be measured and and the price determined at the place where the wells were connected with pipe lines, and not at some distant market that might be found at the end of a pipe line remote from the field and where the cost of transportation might equal or exceed the value of the gas produced. If the pipe line had been built by defendants to Kansas City or Chicago, and the gas transported and marketed there at four or five times its value at the place of production, would it be contended that the price received at either of these distant markets should be the measure of defendants liability?***"

In the case of Warfield Natural Gas Co. v. Allen, (Ky. Ct. App.) 261 Ky. 840, 88 S. W. (2d) 989, the Court said:

"The lease recited, 'That the Lessee is to deliver to the Lessor in tanks, tank cars, or pipe lines a royalty on one-eighth (1/8) of all oil produced and saved from the premises, and to pay for each gas well from the time and while the gas is marketed the sum of one-eighth of preceeds received from the sale thereof, payable each three months'***"

"Defendant had the exclusive right to produce the gas and to market the gas. It was as much its duty to find the market as to find the gas.***

"The lease is silent as to where this market must be found. In such cases, it is usually held to be at the place of production.***

"So we can say the defendant took this gas at the well, and the question is what must it pay for it. Must it pay its value there or must it pay what it may ultimately have got for it?

"The testimony of the plaintiff J. H. Allen shows gas is usually sold at the well in the locality where these wells are situated and the 12 cents per thousand feet is the usual price in that locality, and that this price and custom prevailed there when these leases were made. Then that must have been what the parties contemplated when they made this lease.***

"Nothing was said in the lease about a sale elsewhere and this lease must be held to mean one-eighth of the gross proceeds of a sale of the gas at the well side, and that is all for which defendant must account even though it may market the gas elsewhere and get a much greater sum for it.***"

In the case of Wall v. United Gas Public Service Co., (La Sup. Ct.) 178 La. 908, 152 Sou. 561, the Court said:

"In the lease contract here involved, the lessee was required to pay to the lessor one-eighth of the value of the gas sold off the premises, calculated at the "market price" thereof. The price to be paid was left open or made to depend upon the 'market price' at the time the gas was produced. The lessee settled with the lessors for the gas at 4 cents per thousand cubic feet, which it contends was the 'market price' at the well, its theory being that the market price there is the proper basis for the settlement. It admits that it sold the gas at a place two miles from the field at 5.8 cents per thousand cubic feet. The plaintiffs demand settlement on the basis of the sale price of the gas where sold.

"There is nothing in the contract itself nor in the testimony to show the intent of the parties touching the question whether the term 'market price' meant the price at the well or the price the gas would bring in a market remote from the well. We think it reasonable to assume that the parties intended that, if there was a market for gas in the field, the current market price there should be paid. There is where the gas was reduced to possession and there is where ownership of it sprang into existence. The result of bringing the gas to the surface of the ground in the field was to reduce to ownership there to a commercial commodity.***"

In considering this rule as applied to the payment of royalties, we are not unmindful of the Texas case of Ladd v. Upham, (Tex. Ct. Civ. App.) 58 S.W. (2d) 1037, in which the Court of Civil Appeals at Fort Worth, with only the pleadings of the case before it by virtue of a demurrer having been sustained, held that the lessee (producer) should pay the royalties on the basis of the higher price received for the gas at a distant point from the well where the gas was produced, instead of paying the lower market price at the well; but, that decision was based solely on the working of the lease in which it was expressly provided that the lessee was"***to pay lessor as royalty one-eighth of the proceeds from the sale of gas***. There was no ambiguity in the lease in that case, and the court held that that language required payment of one-eighth of the proceeds from the first sale; and in that connection the court recognized the rule in Scott v. Steinberger, supra, and said that the rule in the Scott case would not be applied because of the specific words in the lease in the Ladd case. The Ladd case was affirmed by the Supreme Court of Texas (Upham v. Ladd, 128 Tex. 14, 95 S.W. 2nd 365), but it based its opinion on a different ground than that relied on by the Court of Civil 'Appeals, and on the question of "the amount due to the lessor" it said:  "That no view on that question can properly be expressed here should be apparent. The contract sued upon is such as to require that it be construed in the light of the facts and circumstances surrounding the par-

ties when it was made." We think by that language that the
Supreme Court cast a doubt on the Court of Civil Appeals opinion
distinguishing its holding from the Scott v. Steinberger holding.

We believe that the rule that where the lease does not provide
otherwise royalties should be paid on the basis of the market
value at the well sheds some light on the question as to what
basis this tax should be paid on. It should likewise be paid on
the basis of the market value at the well.

An objection has been raised to charging this tax on the basis
of "the actual market value" at the well, the ground of the
objection being that there is really no market at the well and
the only market is some distance away at the nearest pipe line
(7 miles in this case); but the Courts of this State have already
answered this objection by giving a rule by which market value
in such cases can be found, and that rule is expressed in A.T.
& S.F. Ry. v. Nation & Slavens, 92 S. W. 823 (market value of
cattle) as follows:

> "***The rule is well settled that where the question is
> what was the value of property at a particular place, and
> there was no market value there, proof may be given of such
> value at other places with the cost of transportation in
> order to *** deduce the value at the place in question.
> Suth. on Damages (2d Ed.) Sec. 445.***"

This rule was adhered to in the case of Dale Oil & Refining Co.
v. City of Tulia, 25, S. W. 2nd. 671 (market value of oil); and
Kerr v. Blaer, 106 S.W. 549 (market value of rice).

We believe that this tax is what is sometimes referred to as a
"severance tax", and if that is true it is reasonable to believe
that the legislature intended to charge the tax immediately
upon the gas being severed from the earth. The Louisiana Natural
gas tax act, which is almost identical with the Texas statute
we are considering, was held to be a "severance tax" in the case
of Bulf Refining Co. v. McFarland, 154 La. 251, 97 Sou. 433. In
57 Corpus Juris 538 "severance tax" is defined as follows:

> "Severance tax. An excise tax upon the privilege of severing,
> or upon the right to sever the natural resources from the
> soil; a tax upon the natural resources severed from the soil."

We should look at this tax from a practical standpoint, and see
how it operates. If we charge this tax on the basis of the higher
market value at the place of sale seven miles away instead of on
the basis of the lower market value at the well, then all the
operator has to do in order to escape the higher tax would be to
sell and convey its "compressor stations" and seven mile pipe
line to another concern, and sell its gas to this other concern at

3 cents at the mouth of the well, and let this other concern compress the gas and transport it seven miles and resell it at 3½ cents. The legislature is presumed to have known the actual conditions the act was to apply to when it passed it; and it intended for the law to operate in a practical manner. We think it intended for the tax to be paid on a basis of the market value at the well.

The final consideration we wish to advance is that by virtue of the fact that the Consituttion of the State of Texas (Sec. 1 Art. VIII) provides that "taxation shall be equal and uniform", it is the duty of the courts to endeavor to place a construction on a taxing statute that will make the tax equal and uniform if there is more than one construction that can be placed on the statute. Such a rule has not been stated by a Texas court, but we think in view of what has been said in other jurisdictions that such a rule can properly be applied in construing our statutes. In the case in question if this tax is charged on the basis of the market value at the well the tax will come nearer being euqal and uniform than if it is charged on the basis of where it is sold,--in some instances at the well and in other instances many miles away from the well. In the case of Feather River Power Co. v. State Board of Equalization (Cal. Sup. Ct.) 206 Ca. 486, 274 Pac. 962, it was said:

> "It is the policy of the law that all property within the state should bear its fair and equal burden of taxation, and a liberal construction will be indulged to accomplish that end."

In the case of City of Providence v. Hall (R. I. Sup. Ct.) 49 R. I. 230, 142 Atl. 156, it was said:

> "If two views are possible, of which one more equitably distributes the burdens of taxation, the court should adopt that view, unless compelled to do otherwise by decisions or a long course of conduct which ought not to be altered."

The conclusion we have reached as to the basis on which to charge this tax is contrary to an opinion dated March 8, 1938, addressed to Hon. George H. Sheppard, by Mr. John McKay and Mr. E. N. Avery Jr., assistants under Attorney General McCraw; and that opinion is therefore overruled.

The words "actual market value" must be given their literal meaning. We have stated at the beginning of this opinion that it is agreed that three and one-half (3½¢) cents per thousand cubic feet is "the actual market value" of this gas at the pipe line company's eighteen inch line. We made that statement because the pipe line company is paying that price. Usually the price paid by the purchasing pipe line company is a proper criterion

on which to figure "market value", but it could be that a producer and a purchaser would enter into a contract for a price less than the market value or more than the market value for reasons known only to themselves, and such a price in those cases should not be taken by the Comptroller as market value. He should be governed by "the actual market value", which may change from time to time.

Our answer to your inquiry is that under the facts of the case in question you should charge the natural gas tax, provided for in Article 7047-b, on the basis of the actual market value at the well; and not on the basis of the actual market value at the place of the first sale if that place is away from the well; and you are advised that if the gas has no market value at the well you may determine its market value at the well by taking the actual market value where there is a market and deducting the cost of taking the gas to that market.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Cecil C. Rotsch
Assistant

CCR:jm

APPROVED:

GERALD MANN

ATTORNEY GENERAL OF TEXAS